NOT DESIGNATED FOR PUBLICATION

No. 121,806

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TIFFANY NEWTON,
*Appellant*,

v.

KANSAS DEPARTMENT OF REVENUE,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed July 24, 2020. Affirmed.

*Russell L. Powell*, of Monaco, Sanders, Racine, Powell & Reidy, L.C., of Leawood, for appellant.

*Nhu Nguyen*, of Legal Services Bureau, Kansas Department of Revenue, for appellee.

Before SCHROEDER, P.J., HILL and GARDNER, JJ.

PER CURIAM: The Kansas Department of Revenue (KDOR) suspended Tiffany Newton's driver's license after she refused to submit to an evidentiary blood test. On judicial review, the district court affirmed the suspension. Newton appeals, arguing that because the results of her evidentiary breath test were 0.00, the arresting officer's request for further testing was improper because he lacked a valid basis to believe that she was driving under the influence of alcohol or drugs.

*Factual and Procedural Background*

In the early morning hours of September 6, 2018, Officer David Tompkins of the Leawood Police Department saw Newton run a red stoplight at the intersection of 95th Street and Mission Road. Tompkins initiated a traffic stop. When he contacted Newton, he began to suspect that she was driving under the influence. She complied with his requests—she did three "pre-exit" tests, three field sobriety tests, and a preliminary breath test (PBT), which showed a minimal alcohol level. Despite passing the PBT, Tompkins placed Newton under arrest for a DUI based on the results of the sobriety tests and his observations. At the police station, Newton passed an evidentiary breath test with a result of 0.00. Tompkins then asked Newton to submit to an evidentiary blood test, which she refused to do.

Because Newton refused the evidentiary blood test, KDOR suspended her driver's license. Newton appealed that suspension in an administrative hearing, but the hearing officer affirmed her suspension. Newton petitioned the district court for review, arguing that Tompkins lacked reasonable grounds to request an evidentiary blood test.

The district court held a hearing on Newton's petition. Under K.S.A. 2018 Supp. 8-1020(p), the district court's review is de novo. Tompkins was the only witness at the hearing. He testified that when he first contacted Newton at about 2:18 a.m., he saw that her eyes were glassy and bloodshot, he heard her slurring her words, and he smelled a slight odor of alcohol and a strong odor of perfume. Yet when he asked her to produce her license and insurance information, she did so without fumbling. Newton denied drinking or using any medications that evening.

Based on his observations, Tompkins decided to do three tests while Newton remained in her car. The first test involved reciting portions of the alphabet. When he asked Newton to recite the alphabet from C to P, she started at A, messed up after Q, then

started over with A and recited to W. For the next test, Tompkins asked Newton to count backwards from 79 to 67. She stumbled over two numbers but said them all in the correct order. Finally, he asked Newton to do a fingerpad test. This test asks the driver to replicate certain finger movements the officer makes. Newton correctly replicated his movements once but failed two other times. Based on Tompkins' observations and these pre-exit tests, he asked Newton to step out of her vehicle for further testing. As Newton did so, Tompkins looked for signs of impairment but did not see any.

Tompkins had Newton do three field sobriety tests: an "HDM," a walk-and-turn test, and a one-leg stand test. Although the transcript of the hearing reflects that the first test was an "HDM," Newton's attorney presumably meant to say "HGN," a horizontal-gaze nystagmus test. Tompkins' testimony focused on the other two tests, however. He observed five validated clues of impairment during the walk-and-turn test:

- Newton could not keep balance during the instructional phase;
- she used her arms for balance on several steps;
- she stepped off the line;
- she made an improper turn; and
- she took the wrong number of steps.

Tompkins then noticed three of the four validated clues of impairment on the one-leg stand:

- Newton used her arms for balance;
- she swayed; and
- she put her raised foot down.

3

Based on this field testing, Tompkins asked Newton to take a PBT and she agreed. It took Newton 10 tries before Tompkins got a valid reading and the results were "low or minimal" for alcohol.

Despite Newton's passing the PBT, Tompkins decided to arrest her. At that point, he suspected there was another intoxicant such as medication or some type of drug contributing to Newton's state. He did not ask whether Newton had consumed any drugs and did not know what type of drug might have impaired her. Instead, he admitted having a "hunch" or a "gut feeling" that she was impaired by something other than alcohol. But he also clarified that his gut feeling stemmed from his training and experience. He had received no DUI training outside the standard National Highway Traffic Safety Administration training at the police academy, but he noted that training discussed drug-related DUIs. He searched Newton's car after he arrested her, but he did not find any drugs in it.

Tompkins still partially believed that Newton might have been impaired by alcohol, so he asked her to take an evidentiary breath test on a machine called the Intoxilyzer 9000. There is a 20-minute deprivation period before a person blows into the Intoxilyzer; during that time, an officer ensures the subject does nothing to skew the results. At the end of Newton's deprivation period, as he was giving her instructions, she burped, which caused Tompkins to restart the 20-minute period. Tompkins believed Newton had burped intentionally to restart the period, though he noted that he had not told her that burping would require a reset. Tompkins determined that, based on the standard rate at which bodies process alcohol, the extra 20-minute period would have lowered her blood-alcohol content by 0.005, one-sixteenth of the legal limit. After the second deprivation period, at 3:52 a.m., Newton took a second breath test and its result was 0.00.

4

After that test came back negative, Tompkins asked Newton at around 4 a.m. to submit to an evidentiary blood test. As Tompkins read Newton the notices regarding blood testing on a form called a DC 70, Newton spontaneously said that she had consumed a bit of alcohol several hours earlier. Newton then refused to submit to the blood test.

After hearing Tompkins' testimony, the district court denied Newton's petition. It concluded that Tompkins had reasonable grounds—based on his observations, Newton's performance on sobriety tests, and the time of night—to believe that Newton was driving under the influence of alcohol and, thus, to request the blood test. The court did not make any statements about intoxicants other than alcohol.

Newton appeals.

*Did the Arresting Officer Lack Probable Cause to Believe that Newton had Driven Under the Influence of Drugs, or Alcohol, or Both?*

Newton raises only one argument on appeal—whether KDOR failed to present sufficient evidence that Officer Tompkins had a valid basis to request an evidentiary blood test.

*Burden of Proof*

Newton's phrasing of the issue reflects her position that KDOR had the burden of proof in the district court. But this is not a criminal case. As KDOR correctly contends, the burden of proof is on the person challenging the administrative action to show that the decision of the agency should be set aside. See K.S.A. 2018 Supp. 8-1020(q) ("Upon review, the licensee shall have the burden to show that the decision of the agency should

5

be set aside."). So Newton has the burden of showing that Tompkins lacked probable cause to request a blood test.

*Standard of Review*

Both parties contend that this court should apply a bifurcated review standard. We generally exercise that standard of review in this context. See *Swank v. Kansas Dept. of Revenue*, 294 Kan. 871, 881, 281 P.3d 135 (2012) ("An appellate court generally reviews a district court's decision in a driver's license suspension case to determine whether it is supported by substantial competent evidence."). So in a driver's license suspension case, an appellate court reviews a district court's factual findings for substantial competent evidence and then consider whether those findings can support the district court's legal conclusion. But when the facts are not in dispute in a driver's license suspension case, our review is unlimited because the court is reviewing a question of law—whether "probable cause" exists under the statute applicable here. See *Rosendahl v. Kansas Dept. of Revenue*, 310 Kan. 474, 479, 447 P.3d 347 (2019); *Swank*, 294 Kan. at 881.

The facts are not in dispute here. Tompkins was the only witness, and the district court credited his testimony. And on appeal, KDOR states that Tompkins' testimony is uncontroverted, and Newton has not challenged any of it. So our review is unlimited—we do not defer to the district court's finding that Tompkins had reasonable grounds for the request, which, as discussed below, is no longer the standard in the 2018 statute.

*Applicable Statute*

Both parties cite K.S.A. 8-1001(b) as the statutory provision that governs this case. Before a 2018 amendment, that statute allowed an officer to request a blood test of an arrested person when "at the time of the request, the officer ha[d] *reasonable grounds* to believe the person was operating or attempting to operate a vehicle under the influence of

6

drugs, or alcohol, or both." (Emphasis added.) K.S.A. 2017 Supp. 8-1001(b). An amendment in 2018 changed that language to allow an officer to request a blood test when "at the time of the request, a law enforcement officer has *probable cause* to believe the person has committed a [DUI]." (Emphasis added.) K.S.A. 2018 Supp. 8-1001(b). That amendment was effective on July 1, 2018. Because Newton committed her DUI in September 2018, we apply the amended statute.

Perhaps unaware of this change, both parties focus their arguments on whether Tompkins had "reasonable grounds" to request a blood test. Both parties acknowledge that the "reasonable grounds" standard under K.S.A. 8-1001(b) is closely related to probable cause. See *Rosendahl*, 310 Kan. at 481 ("Kansas courts evaluate 'reasonable grounds' by looking to probable cause standards."). Our Supreme Court has said that "the term 'reasonable ground' is synonymous in meaning with 'probable cause.'" *Smith v. Kansas Dept. of Revenue*, 291 Kan. 510, 514, 242 P.3d 1179 (2010). And this court has sometimes treated it that way. See, e.g., *Murray v. Kansas Dept. of Revenue*, No. 120,357, 2020 WL 741545, at *4 (Kan. App. 2020) (unpublished opinion*), petition for rev. filed* March 16, 2020; *Weippert v. Kansas Dept. of Revenue*, No. 120,343, 2019 WL 6041814, at *5 (Kan. App. 2019) (unpublished opinion), *petition for rev. filed* December 16, 2019. Still, our Supreme Court has also noted that "an officer may have reasonable grounds to believe a person is operating a vehicle under the influence sufficient to request a test under the statute—but not have the probable cause required to make an arrest under K.S.A. 8-1001." *Smith*, 291 Kan. at 514. This suggests there is some daylight between the two standards. We apply the probable cause standard here.

*Did Officer Tompkins Lack Probable Cause?*

Based on these considerations, then, the precise question on appeal is whether Newton can show that when Tompkins requested the blood test at around 4 a.m., Tompkins lacked probable cause to believe that Newton had committed a DUI.

7

"'Probable cause is determined by evaluating the totality of the circumstances,' giving consideration to 'the information and fair inferences therefrom, known to the officer at the time of arrest,' with 'no rigid application of factors.'" *Swank*, 294 Kan. at 881. "Probable cause exists where the officer's knowledge of the surrounding facts and circumstances creates a reasonable belief that a defendant committed a specific crime. Probable cause does not require an officer have evidence of every element of the crime." *Smith*, 291 Kan. 510, Syl. ¶ 1.

The Kansas DUI statute, K.S.A. 2018 Supp. 8-1567(a), establishes five ways to prove a DUI:

> "(1) The alcohol concentration in the person's blood or breath as shown by any competent evidence . . . is 0.08 or more;
> "(2) the alcohol concentration in the person's blood or breath, as measured within three hours of the time of operating or attempting to operate a vehicle, is 0.08 or more;
> "(3) under the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle;
> "(4) under the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle; or
> "(5) under the influence of a combination of alcohol and any drug or drugs to a degree that renders the person incapable of safely driving a vehicle." K.S.A. 2018 Supp. 8-1567(a).

Tompkins' testimony established the following facts preceding his blood-test request. Newton ran a red stoplight shortly after 2 a.m. in an area she was unfamiliar with. There was an odor of alcohol and a strong odor of perfume in Newton's car. She had glassy, bloodshot eyes and slurred her words. She did not fumble with her license and insurance information while retrieving it. She did poorly on two pre-exit tests (the alphabet and fingerpad tests) but successfully completed the counting test. Newton denied using alcohol or prescription drugs, and Tompkins did not ask about other drugs.

When Newton exited the car, Tompkins looked for signs of impairment but did not see any.

Newton did poorly on two field sobriety tests, showing five clues of impairment on the walk-and-turn test and three on the one-leg stand test. Newton had to try 10 times before getting a valid reading on her PBT, but the results were low or minimal. Based on his training or experience, Tompkins had a "hunch" or a "gut feeling" that some substance besides alcohol was contributing to her state, though he could not say what type of drug that might be. He also still partially believed that she might have been under the influence of alcohol. Tompkins did not find any drugs in Newton's car after he arrested her. At the station, Newton agreed to take a breath test on the Intoxilyzer. She burped at the end of the first 20-minute deprivation period—intentionally, Tompkins believed. After another deprivation period, she took the breath test and the result was 0.00. She seemed to become more lucid the longer she was at the station. And, finally, Tompkins requested a blood test, which Newton refused.

*Insufficient evidence of alcohol influence*

Based on that evidence, when Tompkins requested the blood test, he did not have probable cause to believe that Newton was operating her vehicle (1) under the influence of alcohol to a degree that rendered her incapable of safely driving, (2) under the influence of a combination of alcohol and drugs that rendered her incapable of safely driving, or (3) with a blood-alcohol concentration of 0.08 or more. See K.S.A. 2018 Supp. 8-1567(a)(1)-(3), (5). Although Newton's eyes were glassy and bloodshot, her speech was slurred, her car had an odor of alcohol, and she did poorly on two field sobriety tests, the PBT results were minimal and the Intoxilyzer results were 0.00. Newton also denied drinking anything that evening during the stop (she later admitted to having a small drink, but Tompkins had already requested the blood test, so that does not factor into our probable-cause analysis). Under these circumstances, an officer could not

9

reasonably believe that Newton's consumption of alcohol had rendered her unable to safely operate her vehicle.

*Sufficient evidence of drug influence*

That leaves just one of the statutory provisions that can establish a DUI— "operating a vehicle under the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle." K.S.A. 2018 Supp. 8-1567(a)(4). Newton contends that Tompkins did not have any reasonably trustworthy information to show that she was operating her vehicle under the influence of drugs. She also contends that her case situation is factually similar to *Manley v. Kansas Dept. of Revenue*, No. 118,474, 2018 WL 4264858 (Kan. App. 2018) (unpublished opinion). The panel in that case concluded that the officer did not have a valid basis for requesting a blood test after the breath test results were 0.00. 2018 WL 4264858, at *10-11.

But Tompkins' testimony—which is not in dispute—indicates that Newton showed several signs of impairment: her speech was slurred; her eyes were glassy and bloodshot; she had five validated clues of impairment on her walk-and-turn test; she had three validated clues of impairment on her one-leg stand test; she had trouble following directions during her pre-exit and field sobriety tests, and she ran a red light. So Tomkins could reasonably believe that Newton was driving under the influence of some substance. After the PBT and Intoxilyzer showed that alcohol was not contributing to Newton's state, Tompkins could have reasonably believed that some drug had caused her impairment. Based on that, Tompkins had probable cause to believe that Newton had driven under the influence of a drug or combination of drugs to a degree that rendered her incapable of safely driving, in violation of K.S.A. 2018 Supp. 8-1567(a)(4).

*Manley* is factually distinguishable. Manley did not show the same signs of impairment that Newton did. He performed much better than Newton on field sobriety

10

tests—he did poorly on the one-leg stand test but passed the walk-and-turn test and another test called the Romburg test. His words were not slurred, nor did he have trouble communicating with the officers. Those circumstances are different enough to distinguish Manley's circumstances from Newton's.

Because Officer Tompkins had probable cause to believe Newton had driven under the influence of drugs, he had a valid basis to request the blood test. We thus affirm the district court's order upholding KDOR's suspension of Newton's driver's license for refusing the blood test.

Affirmed.